This Opinion Is a
Precedent of the TTAB

Mailed: May 6, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Alabama Tourism Department*

————

Serial No. 87599292

————

Jean Voutsinas and Kai-Wen Hsieh of Frankfurt Kurnit Klein & Selz, P.C.,
    for Alabama Tourism Department.

William H. Dawe, III, Trademark Examining Attorney, Law Office 108,
    Kathryn E. Coward, Managing Attorney.

————

Before Mermelstein, Lynch, and Larkin,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Alabama Tourism Department ("Applicant") seeks registration on the Principal

Register of the mark shown below:



for "Advertising and marketing services, namely, promoting travel and tourism related to historical information on civil rights in the United States," in International Class 35.[1]

The Trademark Examining Attorney refused registration of Applicant's mark under Section 2(b) of the Trademark Act, 15 U.S.C. § 1052(b), on the ground that the mark includes a simulation of the flag of the United States.[2]

Applicant appealed after the Examining Attorney made the refusal final. The case is fully briefed.[3] We affirm the refusal to register.

---

[1] Application Serial No. 87599292 was filed on September 7, 2017 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a bona fide intention to use the mark in commerce. Applicant disclaimed the exclusive right to use U.S. CIVIL RIGHTS TRAIL apart from the mark as shown. Applicant's amended description of its mark reads as follows: "The mark consists of a circle displaying the wording U.S. CIVIL RIGHTS TRAIL and design; the design consists of a three concentric circle design in which the wording U.S. CIVIL RIGHTS TRAIL appears between arched in between the inner most and the middle concentric circles; the images of two men, one woman and a child walking with the man in back wearing a hat and the man in front holding a stick bearing flag over his shoulder appear superimposed on the inner and middle concentric circle; the inner concentric circle is incomplete on the bottom; the bottom of the middle concentric circle is shaded beneath the feet of the individuals with two small five point stars on each end and one larger five point star in the middle." Color is not claimed as a feature of the mark.

[2] The phrase "flag . . . of the United States" appears in Section 2(b). The flag of the United States is also referred to, both colloquially and in Section 1204.01(a) of the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") (Oct. 2018), as the "American flag," and we will use the two terms interchangeably.

[3] Citations in this opinion to the briefs refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear.

## I. Record on Appeal[4]

The record on appeal includes the following:

- A Wikipedia entry entitled "Flag of the United States," made of record by the Examining Attorney,[5] and Applicant;[6]

- The first page of search results from the USPTO's Trademark Electronic Search System ("TESS") database listing applications and registrations that Applicant claims are for marks comprising the American flag in some form;[7]

- Copies of pages from the TESS database regarding registrations of marks comprising the American flag in some form, made of record by Applicant;[8]

- Pages regarding applications that were refused because they contained the American flag, made of record by the Examining Attorney;[9]

- Webpages displaying the American flag, made of record by the Examining Attorney;[10] and

---

[4] Citations in this opinion to the application record are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO"). We summarize only those portions of the record that are germane to the appeal.

[5] December 19, 2017 Office Action at TSDR 58-68.

[6] June 11, 2018 Response to Office Action at TSDR 26-34; January 8, 2019 Response to Office Action at TSDR 25-33.

[7] June 11, 2018 Response to Office Action at TSDR 9, 35; January 8, 2019 Response to Office Action at TSDR 36-37.

[8] June 11, 2018 Response to Office Action at TSDR 37-127; January 8, 2019 Response to Office Action at TSDR 38-128.

[9] July 11, 2018 Office Action at TSDR 2-12.

[10] January 31, 2019 Final Office Action at TSDR 2-13, 21-26.

- The results of Google database searches regarding the American flag, made of record by Applicant,[11] and the Examining Attorney.[12]

## II.   Section 2(b) Refusal

### A.   Applicable Law

Section 2(b) of the Trademark Act, 15 U.S.C. § 1052(b), prohibits registration, on either the Principal or Supplemental Register, of a mark that "[c]onsists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof." As the Board explained in a case involving municipality insignia, the text of Section 2(b) was carried over from the Trademark Act of 1905 to the Lanham Act of 1946 in substantially the same form, and the absolute bar that it imposes against registration of marks that contain flags and other governmental insignia reflects the sentiment that such insignia are symbols of government authority that ought to be reserved for signifying the government. *In re Dist. of Columbia*, 101 USPQ2d 1588, 1597 n.14 (TTAB 2012), *aff'd sub nom In re City of Houston*, 731 F.3d 1326, 108 USPQ2d 1226 (Fed. Cir. 2013).

There is very little case law discussing the registrability of a mark that "consists of or comprises the flag . . . of the United States."[13] The Board's 1973 decision in *In re*

---

[11] January 8, 2019 Response to Office Action at TSDR 34-35.

[12] January 31, 2019 Final Office Action at TSDR 14-20.

[13] In its appeal brief, Applicant cites *In re Family Emergency Room LLC*, 121 USPQ2d 1886 (TTAB 2017), which involved the Swiss flag; a civil infringement decision, *Bros. of the Wheel M.C. Exec. Council, Inc. v. Mollohan*, 909 F. Supp. 2d 506 (S.D. W. Va. 2012), which discussed in passing the validity of a registration of a mark containing the American flag; a Board decision involving the Norwegian flag, *Knorr-Nahrmittel A.G. v. Havland Int'l, Inc.*, 206

*Waltham Watch Co.*, 179 USPQ 59 (TTAB 1973), clarified that if a flag depicted in a mark incorporates common elements of flag designs but the flag is readily distinguishable from any actual flag of a government, refusal under § 2(b) is not appropriate. *Id*. at 60. The Board's most recent precedential decision under § 2(b) clarified that refusal is appropriate "if the design would be perceived by the public as a flag, regardless of whether other matter appears with or on the flag," *Family Emergency Room*, 121 USPQ2d at 1887-88, and set forth some general principles that govern the application of § 2(b) to all flags referenced in that section.

As the Board explained in *Family Emergency Room*, the word "comprises" in the clause "[c]onsists of or comprises," which appears in subparts (a)-(d) in § 2 of the Trademark Act, means "includes." *Family Emergency Room*, 121 USPQ2d at 1887 n.2 (citation omitted). Section 2(b) thus "prohibits registration of a mark that *includes* a flag . . . or any simulation thereof." *Id*. The Board also noted that § 2(b) requires that registration be refused "if the proposed mark includes a true representation of [a] flag . . . or a simulation thereof," *id*. at 1887*,* and held that the "word 'simulation' in the statute 'is used in its usual and generally understood meaning, namely, to refer to something that gives the appearance or effect or has the characteristics of an original item.'" *Id.* (quoting *Advance Indus.*, 194 USPQ at 346). "Whether particular matter

---

USPQ 827 (TTAB 1980); and two non-precedential Board decisions, *In re Certa ProPainters, Ltd.*, Serial No. 77046679 (TTAB Nov. 14, 2008) and *In re 3P Learning Pty Ltd.*, Serial No. 85641327 (TTAB Sept. 30, 2014), involving the Canadian flag, and a composite mark containing the flags of 12 different countries, respectively. The only Section 2(b) case cited by the Examining Attorney in his brief is *Family Emergency Room*, which in turn cited and quoted *In re Advance Indus. Sec., Inc.*, 194 USPQ 344 (TTAB 1977), a case involving the Coat of Arms of the United States.

is a simulation of a flag is determined by a visual comparison of the matter and the actual flag." *Id.*

The Board in *Family Emergency Room* held that "the relevant question is whether consumers will perceive matter in the mark as a flag." *Id.* at 1888. The Board further observed that "[m]arks containing elements of flags in a stylized or incomplete form are not refused under Section 2(b)," *id.* (citing *Waltham Watch*, 179 USPQ at 60), and held that the "focus of the analysis is on the relevant purchasers' general recollection of the flag, 'without a careful analysis and side-by-side comparison.'" *Id.* (quoting *Advance Indus.*, 194 USPQ at 346).

The Board in *Family Emergency Room* cited the § 2(b) examination guidelines in the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP"), which the Board stated were "appropriate under the statute." *Id.* The Board noted that the TMEP "provides applicants and examining attorneys with a reference work on the practices and procedures relative to prosecution of applications to register marks in the USPTO," *id.*, and contains a section "devoted entirely to marks containing the Swiss federation flag or coat of arms." *Id.* (citing TMEP § 1205.01(d)).

The TMEP similarly contains examination guidelines for "Flags and Simulations of Flags" that discuss the American flag, and display multiple examples of American flag-related marks that should and should not be refused registration under § 2(b). TMEP § 1204.01(a)-(b). The TMEP instructs examining attorneys to consider the following factors that the Board found in *Family Emergency Room* to be appropriate in determining whether consumers will perceive matter in the mark as a flag: "(1)

color; (2) presentation of the mark; (3) words or other designs on the drawing; and (4) use of the mark on the specimen(s)." TMEP § 1204.01(a) (citing *Family Emergency Room*, 121 USPQ2d at 1888 (discussing these factors in the context of the Swiss flag)). Although black-and-white drawings do not depict color, Section 1204.01(a) instructs that these factors should be considered "in regard to both color drawings and black-and-white drawings," and states that "[g]enerally, a refusal should be made where a black-and-white drawing contains unmistakable features of the flag, contains features of the flag along with indicia of a nation, or is shown on the specimen in appropriate colors of that national flag." *Id.* Section 1204.01(a) displays "Examples of Situations Where Registration Should Be Refused," including five involving the American flag.

The TMEP also provides examples of situations where consumers would not perceive a design as a flag, such that refusal under § 2(b) would not be warranted. TMEP § 1204.01(b) (stating that "[m]arks containing elements of flags in a stylized or incomplete form are not refused under §2(b)," and that "[t]he mere presence of some significant elements of flags, such as stars and stripes (U.S. flag) . . . does not necessarily warrant a refusal."). Section 1204.01(b) lists the following scenarios under which registration should not be refused under § 2(b) and includes seven examples of registrable stylized designs of the American flag:

- The flag design is used to form a letter, number, or design.
- The flag is substantially obscured by words or designs.
- The design is not in a shape normally seen in flags.

- The flag design appears in a color different from that normally used in the national flag.

- A significant feature is missing or changed.

TMEP § 1204.01(b).

"Although the [TMEP] does not have the force of law, it 'sets forth the guidelines and procedures followed by the examining attorneys at the'" USPTO. *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 51 USPQ2d 1513, 1516 (Fed. Cir. 1999) (quoting *W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1664 n.8 (Fed. Cir. 1994)). As in *Family Emergency Room*, we hold that both sets of the "above standards, as set forth in the TMEP, are appropriate under the statute" to consider in determining whether consumers will perceive a mark as consisting of or comprising a flag. *Family Emergency Room*, 121 USPQ2d at 1888. We will apply those standards in our analysis of the registrability of Applicant's proposed mark under § 2(b).

### B. Summary of Arguments

We summarize immediately below the general arguments of Applicant and the Examining Attorney. We address their specific arguments in our analysis of the merits of the refusal.

### 1. Applicant's Arguments

Applicant's arguments address four of the scenarios in TMEP § 1204.01(b), namely, that the "flag design in Applicant's Mark (i) is missing significant features of the U.S. flag, (ii) forms another design, (iii) is substantially obscured by other designs

in Applicant's mark, and (iv) is not in a shape normally seen in the U.S. flag." 4 TTABVUE 6.

Applicant also argues that "the fact that the USPTO has approved numerous marks with designs that contain obvious depictions of the U.S. flag shows that marks containing stylized or incomplete flag elements should not be refused registration under §2(b)." *Id.* at 6-7. Applicant devotes a significant portion of its reply brief to its claim that the registration of other marks involving elements of the American flag justifies registration of Applicant's mark. 8 TTABVUE 5-9.

### 2. The Examining Attorney's Arguments

The Examining Attorney argues that Applicant's mark includes a simulation of the U.S. flag under two of the factors set forth in TMEP § 1204.01(a), the presentation of the flag in the mark and the words associated with the drawing. 6 TTABVUE 5-7.[14] With respect to the factors in TMEP § 1204.01(b), the Examining Attorney argues that none of the five scenarios in which a § 2(b) refusal should not be issued exists, *id.* at 7-8, and that the flag design in Applicant's mark is not analogous to any of the examples in § 1204.01(b) of marks that should not be refused registration. *Id.* at 8.

---

[14] The Examining Attorney argues that the two other factors, the color of the mark and the use of the mark on a specimen, do not apply to Applicant's intent-to-use application. 6 TTABVUE 6. We note, however, that merely because Applicant has not claimed that color is a feature of the mark does not mean that Applicant could not depict the flag design in the mark in its black-and-white drawing in any color or combination of colors. *See In re Data Packaging Corp.*, 453 F.2d 1300, 172 USPQ 396, 397 (CCPA 1972) ("there is no reason why an applicant should not be able to obtain a single registration of a design mark covering all different colors in which it may appear, that is to say, not limited to a particular color."). Accordingly, we must assume that Applicant could display the flag design in its mark in the traditional red, white, and blue of the U.S. flag.

With respect to the third-party marks, the Examining Attorney argues that "the issue for consideration here is whether the U.S. flag depicted in applicant's mark will be perceived by the public as a simulation of a U.S. flag; not whether other U.S. Registrations contain stylized U.S. flags." *Id.* at 9. He argues that each application must be considered on its own merits, and that the issuance of registrations containing elements of the U.S. flag is not relevant to the registrability of Applicant's mark. *Id.* at 9 n.1. He concludes that "[u]sing the guidelines established by Sections 1204.01(a) and (b) of the TMEP as to when a § 2(b) refusal should and should not be issued, it is clear that applicant's mark must denied registration under § 2(b) because the black-and-white drawing of the mark contains the unmistakable features of the U.S. flag." *Id.* at 10.

### C. Analysis of Refusal

#### 1. Whether the flag design would be perceived as a simulation of an actual U.S. flag, applying the considerations in TMEP § 1204.01(a)

We determine whether the flag design in Applicant's mark is a prohibited simulation of the U.S. flag "by a visual comparison of the [design] and the actual flag." *Family Emergency Room*, 121 USPQ2d at 1887 (citing *Waltham Watch*, 179 USPQ at 60). We depict below the American flag and Applicant's mark:

[15]

---

[15] December 19, 2017 Office Action at TSDR 58.



Although Applicant's flag design is not an exact reproduction of the American flag, it contains "unmistakable features of the flag," TMEP § 1204.01(a), in the form of the flag's stars and stripes in their familiar positions on the flag. These features of Applicant's design "give[ ] the appearance or effect or ha[ve] the characteristics of the original item[s]" on the actual flag. *Family Emergency Room*, 121 USPQ2d at 1887. Indeed, Applicant's original description of its mark expressly identified its flag design **as** the U.S. flag, referring to "the man in front holding a stick bearing the U.S. flag over his shoulder."[16]

Applicant argues that its flag design does not appear in its mark in what Applicant claims to be "the typical display of a single U.S. flag show[ing] the front side of the flag," 4 TTABVUE 7, but the features of the U.S. flag do not change depending on the manner of its display. The flag design in Applicant's mark is displayed on what Applicant describes as a "stick," and that manner of display simulates how the U.S. flag may appear when it is displayed on an angled flagpole, as shown below:

---

[16] September 7, 2017 Application at TSDR 1.



By Applicant's own admission in its original description of its mark, in its particular orientation in Applicant's mark, Applicant's flag design is intended to depict or simulate the U.S. flag.

The words in Applicant's mark reinforce the perception of the design as at least a simulation of the U.S. flag. Section 1204.01(a) of the TMEP displays as examples of marks that should be refused registration under § 2(b) the designs shown below:



According to TMEP § 1204.01(a), the design on the left "is refused because the word SWISS emphasizes that the design is intended to be a simulation of the Swiss flag," while the design on the right "is refused because the word Texas emphasizes that the design is intended to be the state flag of Texas." *Id.* In both examples, as here, the

---

[17] January 31, 2019 Final Office Action at TSDR 24.

wording names the nation or state whose flag is depicted in the mark and reinforces a consumer's perception of the design as that nation's or state's flag or a simulation thereof.

In Applicant's mark, the features of the U.S. flag are similarly accompanied by "indicia of a nation," *id.*, the letters "U.S.," which abbreviate the words "United States,"[18] in the words "U.S. CIVIL RIGHTS TRAIL." The reference to the United States leaves no doubt, in the words of Applicant's original description of its mark, that "the man in front [is] holding a stick bearing the U.S. flag over his shoulder."[19]

Taking into account "the relevant purchasers' general recollection of the [U.S.] flag, 'without a careful analysis and side-by-side comparison,'" *Family Emergency Room*, 121 USPQ2d at 1888, when we view Applicant's flag design against the backdrop of the "words or other designs on the drawing," TMEP § 1204.01(a), and in the context of the intended use of Applicant's mark in "promoting travel and tourism related to historical information on civil rights in the United States," we find that the U.S. flag and Applicant's flag design are highly similar and that the average member of the public would perceive Applicant's flag design to be a simulation of an actual

---

[18] December 19, 2017 Office Action at TSDR 48 (acronymfinder.com).

[19] In its reply brief, Applicant argues that the "term 'U.S.' modifies the wording 'CIVIL RIGHTS TRAIL,' not the flag elements," and that "[u]pon seeing the term 'U.S.,' consumers would not think about the U.S. flag," but "would consider 'U.S.' as an indicator of the civil rights movement in the United States." 8 TTABVUE 3-4. We disagree. Applicant is correct that "U.S." modifies "CIVIL RIGHTS TRAIL," in the same way that "Swiss" modifies "Guard" and "Texas" modifies "Rock Association" in the examples given in TMEP § 1204.01(a), but as in those examples, the abbreviation "U.S." "emphasizes that the design is intended to be" the U.S. flag or "a simulation of the" U.S. flag. *Id.* We would find, in any event, that the flag design in Applicant's mark is a simulation of the U.S. flag even absent the reference to the U.S.

U.S. flag.[20] We add that we would make the same finding even if the relevant purchasers engaged in a more careful analysis and compared Applicant's design to the U.S. flag. "[T]he matter sought to be registered, when considered in its entirety, is prohibited under Section 2(b) because the proposed mark includes a design consisting of or comprising a simulation of the flag of [the United States]." *Family Emergency Room*, 121 USPQ2d at 1889.

### 2. Whether the elements of the flag create a distinct commercial impression other than as the U.S. flag, applying the considerations in TMEP § 1204.01(b)

We turn now to Applicant's arguments that its mark contains a stylized flag design and is thus registrable under four of the five scenarios set forth in TMEP § 1204.01(b) because consumers would not perceive the design as the U.S. flag or a simulation thereof.

### a. Whether Significant Features of the U.S. Flag Are Missing or Changed

Applicant first argues that significant features of the U.S. flag are missing or changed in its flag design. 4 TTABVUE 7. Applicant cites a WIKIPEDIA description of the U.S. flag as "consist[ing] of thirteen equal horizontal stripes of red (top and bottom) alternating with white, with a blue rectangle in the canton (referred to specifically as the 'union') bearing fifty small, white, five-pointed stars arranged in nine offset horizontal rows, where rows of six stars (top and bottom) alternate with

---

[20] In the absence of restrictions on the classes of consumers of the services identified in the application, we find that the services are directed to members of the general public. *See Family Emergency Room*, 121 USPQ2d at 1888 (finding that consumers of hospital services were the general public).

rows of five stars." *Id.*[21] As noted above, Applicant claims that "the typical display of a single U.S. flag shows the front side of the flag" and that "[o]rdinary consumers would therefore expect to see the stars at the top left corner of the flag, followed by the red and white stripes," citing the results of a "Google image search of the U.S. flag." *Id.*[22]

Applicant argues that "[u]pon encountering Applicant's mark, consumers will readily find that a number of [the] well-known features of the U.S. flag are missing," *id.* at 8, because its flag design (1) "is not in a rectangular shape and does not have four corners;" (2) "[m]ultiple stripes are missing, and the stripes that do appear in the flag design are all slanted in varying directions, and are not horizontal;" (3) "white dots appear on the flag design" instead of "the well-known five-pointed stars in a U.S. flag;" (4) the "rectangular shape of the union in the U.S. flag is also missing—in Applicant's mark, the union appears as a triangle;" and (5) "instead of facing the front, the flag in Applicant's mark is backward facing (the 'union' appears in the right corner, not the traditional left), which is different from how U.S. flags are commonly displayed." *Id.* Applicant analogizes its flag design to the following example in TMEP § 1204.01(b) of a registrable design in which a significant feature of the U.S. flag has been changed:

---

[21] January 8, 2019 Response to Office Action at TSDR 26. As noted above, we must assume that the flag design in the mark may be depicted in the red, white, and blue of the U.S. flag.

[22] *Id.* at TSDR 34-35.



*Id.* at 7.

Applicant's arguments miss the mark. As discussed above, what Applicant calls the "well-known features of the U.S. flag," 4 TTABVUE 8, do not disappear or change depending on the particular manner of the flag's display. In certain manners of display, such as that shown in Applicant's mark and below



some features of the U.S. flag may not be entirely visible or may appear in different orientations than when they appear in what Applicant claims is the "the typical display of a single U.S. flag shows the front side of the flag," *id.* at 7,[23] but they are not "missing" or "changed" in the manner contemplated by TMEP § 1204.01(b). The

---

[23] In that regard, we note that the position and manner of display of the U.S. flag prescribed by 4 U.S.C. § 7 varies depending on the circumstances of the flag's display.

flag displayed immediately above shares many of the characteristics that Applicant attributes to its flag design, including a "triangular" display of the union, non-horizontal stripes slanted in varying directions, and a "backward facing display," *id.* at 8, but no reasonable observer of that flag would believe that features are missing or changed, or view it as something other than the U.S. flag.

The scenario in TMEP § 1204.01(b) in which a "significant feature is missing or changed" is exemplified by the design shown above, in which the stars in the union of the U.S. flag have been rearranged to form what appears to be the letter "U." That rearrangement changes a "significant feature" of the U.S. flag, the layout of the rows of stars, to create a new design that does not simulate the actual flag. Applicant's flag design does not change the U.S. flag in this manner, and this scenario in TMEP § 1204.01(b) does not apply to Applicant's mark.

### b. Whether the Flag Design is Used to Form a Letter, Number, or Design

Applicant next argues that "the flag element in Applicant's Mark forms and is incorporated in a greater overall design, namely, a depiction of a scene from the civil rights movement." 4 TTABVUE 10. Applicant analogizes its mark to one of the two marks that are shown in TMEP § 1204.01(b) as examples of this scenario:[24]

---

[24] Applicant does not address the other example, but we show and discuss it below following our discussion of the example cited by Applicant and the mark in a non-precedential decision cited by Applicant.



Applicant argues that in the example above, "[t]here is no doubt that the mark depicts a U.S. flag, especially in view of the term 'U.S.A.' located directly below the flag design," but claims that the mark is registrable "because its flag component is incorporated in a design, namely, a map of the continental United States." *Id.*

Applicant also analogizes its mark to the mark at issue in the Board's non-precedential decision in *3P Learning*:[25]



---

[25] "Board decisions which are not designated as precedent are not binding on the Board, but may be cited and considered for whatever persuasive value they may hold." *In re Soc'y of Health & Physical Educators*, 127 USPQ2d 1584, 1587 n.7 (TTAB 2018).

4 TTABVUE 9. Applicant argues that "[a]lthough the mark contains multiple countries' national flags in their entireties (including the U.S. flag), the Board reversed the refusal to register under §2(b) because the flags form another design," because "the flags 'do not have the commercial impression of national flags but rather as designations of individuals from various nations,'" and because the other elements of the mark minimize the flags' individual impact and "emphasize[ ] the international aspect of the applied-for goods and services." *Id.* at 9-10 (quoting *3P Learning*, 12 TTABVUE 11-12 (Serial No. 85641327) (amended decision)).

Applicant argues that when "[e]ncountering Applicant's Mark, consumers would first notice the four walking human figures, prominently displayed in the front and center of the Mark" and that "[s]eeing those figures in conjunction with the phrase U.S. CIVIL RIGHTS TRAIL and the flag design, consumers would immediately understand Applicant's Mark to be a symbol of the civil rights movement." *Id.* at 10. Applicant contends that "[t]he flag design, which takes up less than one fourth of Applicant's Mark, merely completes such symbol" and that its "purpose is to describe and emphasize the other design elements, such as the significance of the walking figures and who they portray (civil rights activists)." *Id.*

Applicant claims that "[l]ike the national flags in the mark in *In re 3P Learning PTY Ltd.*, Applicant's flag design signifies something other than a national flag," specifically, "the hard work, sacrifice, long journey, and emotions that civil rights activists encountered while fighting to obtain equal rights for African Americans in the United States," *id.*, and that the "flag design and component term U.S. are mere

background characters that provide information and support for that depiction." *Id.* at 10-11.

As noted above, we are not bound by the decision or analysis in *3P Learning*, but the case is easily distinguishable. The Board found that in the subject mark, each national flag was "use[d] as the torso of each figure" and that such use was "use 'to form a design'" within the meaning of that particular scenario in TMEP § 1204.01(b). 12 TTABVUE 10 (Serial No. 85641327). The Board noted that "the use of the flag in a manner that serves as the torso of the individuals is not a traditional flag design and while they may be generally recognizable, as incorporated in this mark, they do not have the commercial impression of national flags but rather as designations of individuals from various nations." *Id.* at 11. The Board concluded that

> the flags are not being displayed as flags, but rather are incorporated into the design as torsos of individuals. In this case, where each flag forms the torso of individuals positioned in a circle around a globe signifying the international aspect of Applicant's goods and services we find that it is not barred by Section 2(b).

*Id.* at 12.

Unlike the flag designs in the mark in *3P Learning*, or in the marks in TMEP § 1204.01(b), the first of which is shown above and the second of which is shown below,



Applicant's flag design is not incorporated into wording or another design element, but is a self-standing design within Applicant's mark. Although the flag design is conceptually related to the design elements of the mark, that alone is insufficient to implicate this scenario in TMEP § 1204.01(b). The American flag is similarly part of the designs in the examples of unregistrable marks in TMEP § 1204.01(a) depicted below, which we consider more analogous because all significant features of the flag are present and the words or designs in the marks do not affect the flag designs in such a way that significant features of the U.S. flag are changed or missing:



The flag design in Applicant's marks does not "form[ ] **another** design," TMEP § 1204.01(b) (emphasis added), specifically, "a letter, number, or design," *id.*, such as "USA," a map, or a torso, as contemplated under TMEP § 1204.01(b). As a result, this scenario is inapplicable to Applicant's mark.

### c. Whether the Flag Design is Substantially Obscured by Words or Designs

Applicant's third argument is that "TMEP §1204.01(b) specifies that registration should not be refused where the flag in a mark is substantially obscured by designs." 4 TTABVUE 11. Applicant analogizes its mark to the mark shown below, which is displayed in TMEP §1204.01(b) as an example of a mark that fits this scenario:



Applicant argues that "just like the example from the TMEP above, registration should not be refused here because the flag in Applicant's Mark is substantially obscured by other designs." 4 TTABVUE 12. Applicant claims that "the designs of two adult figures cover both sides of the flag design, and the design of a child figure conceals almost all of the bottom half of the flag." *Id.*

The adverb "substantially" in TMEP § 1204.01(b) means "to a large degree."[26] Unlike the flag design in the example shown immediately above, the flag design in Applicant's mark is not obscured to a large degree by other elements of the mark:



Although portions of some of the stripes in the flag disappear behind the silhouette of the walking child and certain edges of the unfurled banner disappear behind the silhouettes of two of the walking adults, the simulations of the stars in the "union" and most of the stripes, as well as the flag as a whole, remain clearly visible, and the flag is immediately recognizable as such. As evidenced by the example accompanying this scenario in § 1204.01(b), as well as the examples of registrable marks in the preceding section, in which depictions of people or other elements appear in front of the flag designs, this scenario contemplates marks in which a significant portion of a flag design is not visible. The flag design in Applicant's mark does not meet that criterion, and this scenario is inapplicable, because the flag design is not so obscured that consumers would not perceive it as the U.S. flag or a simulation thereof.

---

[26] CAMBRIDGE DICTIONARY (dictionary.cambridge.org/us, last accessed on May 1, 2020. The Board may take judicial notice of dictionary definitions, including online dictionaries. *See, e.g., In re Omniome, Inc.*, 2020 USPQ2d 3222, *2 n.17 (TTAB 2020).

### d. Whether the Flag Design is Not in a Shape Normally Seen in the U.S. Flag

Finally, Applicant invokes the scenario in TMEP § 1204.01(b) that states that registration should not be refused "where the flag in a mark is not in a shape normally seen in flags." 4 TTABVUE 12. Applicant analogizes its mark to the two examples of such marks shown in TMEP § 1204.01(b). The first example is shown below:



Applicant argues that in this mark, "only a corner of the flag is depicted, without all the stripes and stars traditionally associated with the U.S. flag," and that "[s]imilarly, in Applicant's Mark, only a small triangular portion of the flag appears, and not all the stars and stripes are visible. Approximately only one third of the stars that normally appear on the U.S. flag are visible in Applicant's Mark, and only a small portion of stripes can be seen." 4 TTABVUE 12. Applicant also argues that "whereas the American flag ordinarily appears as a rectangle, Applicant's Mark contains a small triangular portion of the U.S. flag, followed by some stripes located behind one of the walking figures and angled sideways and downward." *Id.* at 12-13.

The second example in this scenario in TMEP § 1204.01(b) is shown below:



Applicant argues that this example

> consists of two rectangular U.S. flags that display parallel rows of stars and stripes. However, because the flags are vertical and elongated, they are not considered to be in the normal flag shape and therefore the mark is registrable. Similarly, the flag in Applicant's Mark is not displayed horizontally and is not in the normal flag shape. In fact, the flag in Applicant's Mark is even less similar to an actual U.S. flag than the example in the TMEP and noted above because, unlike the above example, the flag in Applicant's Mark is not rectangular, does not have four corners, and does not display the requisite parallel rows of stars and stripes in a U.S. flag. . . . Applicant's Mark is not in a shape normally seen in flags.

*Id.* at 13.

Applicant's arguments that its flag design is "not in the normal flag shape" of the U.S. flag because the design "is not rectangular, does not have four corners, and does not display the requisite parallel rows of stars and stripes in a U.S. flag," *id.*, are similar in nature to its arguments that significant elements of the U.S. flag are missing or changed due to the manner of display of the flag design in Applicant's

mark. As shown and discussed above, the particular manner in which the flag design is displayed in Applicant's mark is consistent with the manner in which the U.S. flag appears when it is displayed on a flagpole. The required "visual comparison of the [design] and the actual flag," *Family Emergency Room*, 121 USPQ2d at 1887, may take into account any reasonable form in which the actual flag may appear or be displayed. Applicant's flag design is not artificially elongated or strangely shaped, as in the examples in TMEP § 1204.01(b) shown above, and there is thus no basis for finding that the design is "not in a shape normally seen in" the U.S. flag as contemplated in TMEP § 1204.01(b). This scenario also does not apply to Applicant's mark because Applicant's design would be perceived as the U.S. flag or a simulation thereof.

### e.    Summary

None of the four asserted scenarios in TMEP § 1204.01(b) applies to Applicant's mark because the flag "design shown in the proposed mark is not sufficiently altered, stylized, or merged with the other elements in the mark, so as to create a distinct commercial impression, other than as a simulation of the [U.S.] flag." *Family Emergency Room*, 121 USPQ2d at 1889.

### 3.    The Existence of Third-Party Registrations of Marks Containing Elements of the U.S. Flag

In its appeal brief, Applicant cites and depicts more than 30 registered marks that contain elements of the U.S. flag. 4 TTABVUE 15-22.[27] Applicant argues that "the

---

[27] Applicant also cites and displays marks in pending applications. 4 TTABVUE 14-16. We need not consider the applications because "[a]n application is not evidence of anything

Examining Attorney ignored the numerous registrable, stylized marks that contain unmistakable features of the U.S. flag," *id.* at 14, which "include the seven registrable marks featured in TMEP § 1204.01(b) as well as many marks registered and applied-for on the U.S. Trademark Register that contain recognizable U.S. flags." *Id.* Applicant claims that these registrations and applications show that "stylized marks with designs that include flags are generally not refused registration under § 2(b)." *Id.* at 22.

Applicant argues that most of the examples

> contain much more complete depictions of U.S. flags than Applicant's Mark. To refuse registration of Applicant's Mark while permitting registration of the foregoing marks would be to treat Applicant's Mark inconsistently with Trademark Office practice. Applicant should be permitted to rely on the Trademark Office's practice with respect to the foregoing marks. The courts and the TTAB encourage the Trademark Office to use a uniform standard in assessing marks and Applicant is entitled to such consistent treatment.

*Id.* (citing *In re Nett Designs, Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001)).

In its reply brief, Applicant argues that the

> Examining Attorney does not address the Board's and courts' desire for consistent treatment of marks that are similar in nature, merely stating that "each application must be considered on its own record" (Footnote 1, Examining Attorney's brief). The Examining Attorney's refusal to address this need for consistent treatment at the Trademark Office is surely not an oversight as indeed, it would be impossible for the Examining Attorney to

---

except that the application was filed on a certain date . . . ." *Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1634 n.11 (TTAB 2007).

> reconcile his decision to deny registration here with the
> decision to register or allow these other marks.

8 TTABVUE 5.

Applicant acknowledges that "the Board and courts are not bound by prior registrations for analogous marks," but argues that the Board and the courts "encourage consistency in the Trademark Office's assessment of the registrability of marks, and on numerous occasions have looked at prior registrations and/or applications to determine the registrability of a particular mark." *Id.*[28] Applicant contends that "[w]hen those other flag marks are considered, it is clear that the Examining Attorney's refusal in this case 'is clearly inconsistent with what this applicant had come to expect from the United States Patent and Trademark Office over the past decade of prosecuting several similar applications.'" 8 TTABVUE 6 (quoting *Alphonse Capone Enters.*, 10 TTABVUE 7 (Serial No. 85453371)).

Applicant's rely brief concludes with the argument that

> [t]here is simply no justification for why these marks, which contain in many cases complete and accurate depictions of American flags with all of their elements plainly visible and which form the centerpiece of the marks, were permitted registration but Applicant's Mark was refused. Based on and in reliance on the numerous federal registrations and allowed applications for marks containing obvious U.S. flag designs, it is reasonable for Applicant to think that Applicant's Mark would not encounter a § 2(b) refusal.

*Id.* at 9.

---

[28] In support, Applicant cites *In re Women's Publ'g Co.*, 23 USPQ2d 1876 (TTAB 1992), and three non-precedential cases, *In re Armadahealth, LLC*, Serial No. 86713902 (TTAB June 28, 2017), *In re Alphonse Capone Enters., Inc.*, Serial No. 85453371 (TTAB Apr. 19, 2013), and *HEB Growers Co.*, Serial No. 85027087 (TTAB June 29, 2012). 8 TTABVUE 5.

These arguments, particularly Applicant's accusation that the Examining Attorney's "refusal to address this need for consistent treatment at the Trademark Office is surely not an oversight as indeed, it would be impossible for the Examining Attorney to reconcile his decision to deny registration here with the decision to register or allow these other marks," *id.* at 5, are misplaced. The Examining Attorney's obligation was to determine the registrability of the applied-for mark under § 2(b) based on the appearance of the flag design in Applicant's mark and a comparison of that design to the American flag, *Family Emergency Room*, 121 USPQ2d at 1887, taking into account the considerations and examples of registrable and unregistrable marks set forth in TMEP § 1204.01 and the record made during prosecution. He properly determined that the mark was unregistrable under the statute, and neither he nor we have any obligation "to reconcile his decision to deny registration here with the decision to register or allow . . . other marks." 8 TTABVUE 5.[29] In addition, Applicant's evidentiary submission almost certainly presents an

---

[29] The cases cited by Applicant in support of its argument that "on numerous occasions [the Board and courts] have looked at prior registrations and/or applications to determine the registrability of a particular mark," 8 TTABVUE 5, are distinguishable because none of them involved a Section 2(b) refusal. The precedential *Women's Publ'g* decision involved genericness, descriptiveness, and acquired distinctiveness, while the non-precedential decisions in *Armadahealth* and *HEB Grocery* involved descriptiveness. The Board noted in *Armadahealth* and *HEB Grocery* that in descriptiveness cases such as those two and *Women's Publ'g*, "[c]ase law recognizes that [third-party] registrations can be used as a form of dictionary definition to illustrate how a term is perceived in the trade or industry." 15 TTABVUE 11 (Serial Nos. 86713902 and 86802355); 10 TTABVUE 9 (Serial No. 85027087). The non-precedential decision in *Alphonse Capone Enters.* involved a refusal to register on the ground that the applicant sought "registration of more than one mark." 10 TTABVUE 1 (Serial No. 85453371). The Board noted in that case that the applicant had previously registered similar marks based "upon one substantially similar, and another identical specimen," to the one at issue on appeal, *id.* at 7, and that the refusal was "clearly inconsistent with what this applicant had come to expect from the United States Patent and

incomplete picture of USPTO practice, as it omits marks in applications that were refused registration under § 2(b) in a manner likely to be highly consistent with the action in this case.

Applicant cites the Federal Circuit's decision in *Nett Designs* for the proposition that the "court encourages the PTO to achieve a uniform standard for assessing registrability of marks." 4 TTABVUE 22 (citing *Nett Designs*, 57 USPQ2d at 1566). In the very next sentence in the opinion, however, the court held that "[n]onetheless, the Board (and this court in its limited review) must assess each mark on the record of public perception submitted with the application," *id.*, and the court subsequently held that the third-party "registrations that Nett Designs submitted to the examiner" had "little persuasive value" even on the issue of whether the phrase THE ULTIMATE BIKE RACK in the applied-for mark was merely descriptive of bicycle racks and had to be disclaimed. The court held that "[e]ven if some prior registrations had some characteristics similar to Nett Designs' application, the PTO's allowance of such prior registrations does not bind the Board or this court." *Id.*

The Board recently reiterated that "[w]hile we recognize that 'consistency is highly desirable,' . . . consistency in examination is not itself a substantive rule of trademark law, and a desire for consistency with the decisions of prior examining attorneys must yield to proper determinations under the Trademark Act and rules." *In re Am. Furniture Warehouse Co.*, 126 USPQ2d 1400, 1407 (TTAB 2018) (quoting *In re Omega*

Trademark Office over the past decade of prosecuting several similar applications, and even one identical application." *Id.*

*SA*, 494 F.3d 1362, 83 USPQ2d 1541, 1544 (Fed. Cir. 2007) and citing *In re Cordua Rests.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016)). We do not believe that our decision here is inconsistent with the registration of the third-party marks cited by Applicant, but to the extent that it is, it is the decision required under the statute on the record before us.

For the reasons discussed above, the Examining Attorney properly determined that Applicant's mark is unregistrable under § 2(b) based on our precedent and applying the examination guidelines set forth in TMEP § 1204.01. We need to go no further to affirm the refusal to register.

**Decision**: The refusal to register is affirmed.